In re Thomas F. DEUEL, Yue–Sheng Li, Ned R. Siegel and Peter G. Milner.

No. 94–1202.

United States Court of Appeals, Federal Circuit.

March 28, 1995.

G. Harley Blosser, Senniger, Powers, Leavitt & Roedel, of St. Louis, MO, argued for appellants. With him on the brief was Donald G. Leavitt.

Donald S. Chisum, Morrison & Foerster, Seattle, WA, argued for amicus curiae, The Biotechnology Industry Ass'n and The Bay Area Bioscience Center. With him on the brief were Debra A. Shetka, Morrison & Forester, Palo Alto, CA and Robert P. Blackburn, Emeryville, CA.

Teddy S. Gron, Acting Associate Sol., Arlington, VA, argued for appellee. With him on the brief was Albin F. Drost, Acting Sol. Nancy J. Linck, Office of the Sol., Arlington, VA, represented appellee.

Before ARCHER, Chief Judge, NIES and LOURIE, Circuit Judges.

LOURIE, Circuit Judge.

Thomas F. Deuel, Yue–Sheng Li, Ned R. Siegel, and Peter G. Milner (collectively "Deuel") appeal from the November 30, 1993 decision of the U.S. Patent and Trademark Office Board of Patent Appeals and Interferences affirming the examiner's final rejection of claims 4–7 of application Serial No. 07/542,232, entitled "Heparin–Binding

Growth Factor," as unpatentable on the ground of obviousness under 35 U.S.C. § 103 (1988). *Ex parte Deuel*, 33 USPQ2d 1445 (Bd.Pat.App.Int.1993). Because the Board erred in concluding that Deuel's claims 5 and 7 directed to specific cDNA molecules would have been obvious in light of the applied references, and no other basis exists in the record to support the rejection with respect to claims 4 and 6 generically covering all possible DNA molecules coding for the disclosed proteins, we reverse.

### BACKGROUND

The claimed invention relates to isolated and purified DNA and cDNA molecules encoding heparin-binding growth factors ("HBGFs").[1] HBGFs are proteins that stimulate mitogenic activity (cell division) and thus facilitate the repair or replacement of damaged or diseased tissue. DNA (deoxyribonucleic acid) is a generic term which encompasses an enormous number of complex macromolecules made up of nucleotide units. DNAs consist of four different nucleotides containing the nitrogenous bases adenine, guanine, cytosine, and thymine. A sequential grouping of three such nucleotides (a "codon") codes for one amino acid. A DNA's sequence of codons thus determines the sequence of amino acids assembled during protein synthesis. Since there are 64 possible codons, but only 20 natural amino acids, most amino acids are coded for by more than one codon. This is referred to as the "redundancy" or "degeneracy" of the genetic code.

DNA functions as a blueprint of an organism's genetic information. It is the major component of genes, which are located on chromosomes in the cell nucleus. Only a small part of chromosomal DNA encodes functional proteins.

Messenger ribonucleic acid ("mRNA") is a similar molecule that is made or transcribed from DNA as part of the process of protein synthesis. Complementary DNA ("cDNA") is a complementary copy ("clone") of mRNA, made in the laboratory by reverse transcription of mRNA. Like mRNA, cDNA contains only the protein-encoding regions of DNA. Thus, once a cDNA's nucleotide sequence is known, the amino acid sequence of the protein for which it codes may be predicted using the genetic code relationship between codons and amino acids. The reverse is not true, however, due to the degeneracy of the code. Many other DNAs may code for a particular protein. The functional relationships between DNA, mRNA, cDNA, and a protein may conveniently be expressed as follows:

Collections ("libraries") of DNA and cDNA molecules derived from various species may be constructed in the laboratory or obtained from commercial sources. Complementary DNA libraries contain a mixture of cDNA clones reverse-transcribed from the mRNAs found in a specific tissue source. Complementary DNA libraries are tissue-specific because proteins and their corresponding mRNAs are only made ("expressed") in specific tissues, depending upon the protein. Genomic DNA ("gDNA") libraries, by contrast, theoretically contain all of a species' chromosomal DNA. The molecules present in cDNA and DNA libraries may be of unknown function and chemical structure, and

1. For a more extensive discussion of recombinant DNA technology, *see In re O'Farrell*, 853 F.2d 894, 895–99, 7 USPQ2d 1673, 1674–77 (Fed.Cir.1988); *Amgen Inc. v. Chugai Pharma-* *ceutical Co.*, 927 F.2d 1200, 18 USPQ2d 1016 (Fed.Cir.), *cert. denied*, 502 U.S. 856, 112 S.Ct. 169, 116 L.Ed.2d 132 (1991).

the proteins which they encode may be unknown. However, one may attempt to retrieve molecules of interest from cDNA or gDNA libraries by screening such libraries with a gene probe, which is a synthetic radiolabelled nucleic acid sequence designed to bond ("hybridize") with a target complementary base sequence. Such "gene cloning" techniques thus exploit the fact that the bases in DNA always hybridize in complementary pairs: adenine bonds with thymine and guanine bonds with cytosine. A gene probe for potentially isolating DNA or cDNA encoding a protein may be designed once the protein's amino acid sequence, or a portion thereof, is known.

As disclosed in Deuel's patent application, Deuel isolated and purified HBGF from bovine uterine tissue, found that it exhibited mitogenic activity, and determined the first 25 amino acids of the protein's N-terminal sequence.[2] Deuel then isolated a cDNA molecule encoding bovine uterine HBGF by screening a bovine uterine cDNA library with an oligonucleotide probe designed using the experimentally determined N-terminal sequence of the HBGF. Deuel purified and sequenced the cDNA molecule, which was found to consist of a sequence of 1196 nucleotide base pairs. From the cDNA's nucleotide sequence, Deuel then predicted the complete amino acid sequence of bovine uterine HBGF disclosed in Deuel's application.

Deuel also isolated a cDNA molecule encoding human placental HBGF by screening a human placental cDNA library using the isolated bovine uterine cDNA clone as a probe. Deuel purified and sequenced the human placental cDNA clone, which was found to consist of a sequence of 961 nucleotide base pairs. From the nucleotide sequence of the cDNA molecule encoding human placental HBGF, Deuel predicted the complete amino acid sequence of human placental HBGF disclosed in Deuel's application. The predicted human placental and bovine uterine HBGFs each have 168 amino acids and calculated molecular weights of 18.9 kD. Of the 168 amino acids present in the two HBGFs discovered by Deuel, 163 are identi-

cal. Deuel's application does not describe the chemical structure of, or state how to isolate and purify, any DNA or cDNA molecule except the disclosed human placental and bovine uterine cDNAs, which are the subject of claims 5 and 7.

Claims 4–7 on appeal are all independent claims and read, in relevant part, as follows:

4. A purified and isolated DNA sequence consisting of a sequence encoding human heparin binding growth factor of 168 amino acids having the following amino acid sequence: Met Gln Ala ... [remainder of 168 amino acid sequence].

5. The purified and isolated cDNA of human heparin-binding growth factor having the following nucleotide sequence: GTCAAAGGCA ... [remainder of 961 nucleotide sequence].

6. A purified and isolated DNA sequence consisting of a sequence encoding bovine heparin binding growth factor of 168 amino acids having the following amino acid sequence: Met Gln Thr ... [remainder of 168 amino acid sequence].

7. The purified and isolated cDNA of bovine heparin-binding growth factor having the following nucleotide sequence: GAGTGGAGAG ... [remainder of 1196 nucleotide sequence].

Claims 4 and 6 generically encompass *all* isolated/purified DNA sequences (natural and synthetic) encoding human and bovine HBGFs, despite the fact that Deuel's application does not describe the chemical structure of, or tell how to obtain, any DNA or cDNA except the two disclosed cDNA molecules. Because of the redundancy of the genetic code, claims 4 and 6 each encompass an enormous number of DNA molecules, including the isolated/purified chromosomal DNAs encoding the human and bovine proteins. Claims 5 and 7, on the other hand, are directed to the specifically disclosed cDNA molecules encoding human and bovine HBGFs, respectively.

During prosecution, the examiner rejected claims 4–7 under 35 U.S.C. § 103 as unpatentable over the combined teachings of Boh-

2. Deuel determined that the N-terminal sequence of bovine uterus HBGF is Gly–Lys–Lys–Glu–Lys– Pro–Glu–Lys–Lys–Val–Lys–Lys–Ser–Asp–Cys– Gly–Glu–Trp–Gln–Trp–Ser–Val–Cys–Val–Pro.

len[3] and Maniatis.[4] The Bohlen reference discloses a group of protein growth factors designated as heparin-binding brain mitogens ("HBBMs") useful in treating burns and promoting the formation, maintenance, and repair of tissue, particularly neural tissue. Bohlen isolated three such HBBMs from human and bovine brain tissue. These proteins have respective molecular weights of 15 kD, 16 kD, and 18 kD. Bohlen determined the first 19 amino acids of the proteins' N-terminal sequences, which were found to be identical for human and bovine HBBMs.[5] Bohlen teaches that HBBMs are brain-specific, and suggests that the proteins may be homologous between species. The reference provides no teachings concerning DNA or cDNA coding for HBBMs.

Maniatis describes a method of isolating DNAs or cDNAs by screening a DNA or cDNA library with a gene probe. The reference outlines a general technique for cloning a gene; it does not describe how to isolate a particular DNA or cDNA molecule. Maniatis does not discuss certain steps necessary to isolate a target cDNA, e.g., selecting a tissue-specific cDNA library containing a target cDNA and designing an oligonucleotide probe that will hybridize with the target cDNA.

The examiner asserted that, given Bohlen's disclosure of a heparin-binding protein and its N-terminal sequence and Maniatis's gene cloning method, it would have been *prima facie* obvious to one of ordinary skill in the art at the time of the invention to clone a gene for HBGF.[6] According to the examiner, Bohlen's published N-terminal sequence would have motivated a person of ordinary skill in the art to clone such a gene because cloning the gene would allow recombinant production of HBGF, a useful protein. The examiner reasoned that a person of ordinary

skill in the art could have designed a gene probe based on Bohlen's disclosed N-terminal sequence, then screened a DNA library in accordance with Maniatis's gene cloning method to isolate a gene encoding an HBGF. The examiner did not distinguish between claims 4 and 6 generically directed to all DNA sequences encoding human and bovine HBGFs and claims 5 and 7 reciting particular cDNAs.

In reply, Deuel argued, *inter alia*, that Bohlen teaches away from the claimed cDNA molecules because Bohlen suggests that HBBMs are brain-specific and, thus, a person of ordinary skill in the art would not have tried to isolate corresponding cDNA clones from human placental and bovine uterine cDNA libraries. The examiner made the rejection final, however, asserting that

> [t]he starting materials are not relevant in this case, because it was well known in the art at the time the invention was made that proteins, especially the general class of heparin binding proteins, are highly homologous between species and tissue type. It would have been entirely obvious to attempt to isolate a known protein from different tissue types and even different species.

No prior art was cited to support the proposition that it would have been obvious to screen human placental and bovine uterine cDNA libraries for the claimed cDNA clones. Presumably, the examiner was relying on Bohlen's suggestion that HBBMs may be homologous between species, although the examiner did not explain how homology between species suggests homology between tissue types.

The Board affirmed the examiner's final rejection. In its opening remarks, the Board noted that it is "constantly advised by the

3. European Patent Application No. 0326075, naming Peter Bohlen as inventor, published August 2, 1989.

4. Maniatis et al., *Molecular Cloning: A Laboratory Manual*, "Screening Bacteriophage [lambda] Libraries for Specific DNA Sequences by Recombination in *Escherichia coli*," Cold Spring Harbor Laboratory, New York, 1982, pp. 353–361.

5. Bohlen's disclosed N-terminal sequence for human and bovine HBBMs is · Gly–Lys–Lys–Glu–

Lys–Pro–Glu–Lys–Lys–Val–Lys–Ser–Asp–Cys–Gly–Glu–Trp–Gln. This sequence matches the first 19 amino acids of Deuel's disclosed N-terminal sequence.

6. The examiner and the Board apparently used the term "gene" to refer both to natural (chromosomal) DNA and synthetic cDNA. We will use the several terms as appropriate.

patent examiners, who are highly skilled in this art, that cloning procedures are routine in the art." According to the Board, "the examiners urge that when the sequence of a protein is placed into the public domain, the gene is also placed into the public domain because of the routine nature of cloning techniques." Addressing the rejection at issue, the Board determined that Bohlen's disclosure of the existence and isolation of HBBM, a functional protein, would also advise a person of ordinary skill in the art that a gene exists encoding HBBM. The Board found that a person of ordinary skill in the art would have been motivated to isolate such a gene because the protein has useful mitogenic properties, and isolating the gene for HBBM would permit large quantities of the protein to be produced for study and possible commercial use. Like the examiner, the Board asserted, without explanation, that HBBMs are the same as HBGFs and that the genes encoding these proteins are identical. The Board concluded that "the Bohlen reference would have suggested to those of ordinary skill in this art that they should make the gene, and the Maniatis reference would have taught a technique for 'making' the gene with a reasonable expectation of success." Responding to Deuel's argument that the claimed cDNA clones were isolated from human placental and bovine uterine cDNA libraries, whereas the combined teachings of Bohlen and Maniatis would only have suggested screening a brain tissue cDNA library, the Board stated that "the claims before us are directed to the product and not the method of isolation. Appellants have not shown that the claimed DNA was not present in and could not have been readily isolated from the brain tissue utilized by Bohlen." Deuel now appeals.[7]

## DISCUSSION

■ Obviousness is a question of law, which we review *de novo*, though factual findings underlying the Board's obviousness determination are reviewed for clear error.

*In re Vaeck*, 947 F.2d 488, 493, 20 USPQ2d 1438, 1442 (Fed.Cir.1991); *In re Woodruff*, 919 F.2d 1575, 1577, 16 USPQ2d 1934, 1935 (Fed.Cir.1990). The examiner bears the burden of establishing a *prima facie* case of obviousness. *In re Rijckaert*, 9 F.3d 1531, 1532, 28 USPQ2d 1955, 1956 (Fed.Cir.1993); *In re Oetiker*, 977 F.2d 1443, 1445, 24 USPQ2d 1443, 1444 (Fed.Cir.1992). Only if this burden is met does the burden of coming forward with rebuttal argument or evidence shift to the applicant. *Rijckaert*, 9 F.3d at 1532, 28 USPQ2d at 1956. When the references cited by the examiner fail to establish a *prima facie* case of obviousness, the rejection is improper and will be overturned. *In re Fine*, 837 F.2d 1071, 1074, 5 USPQ2d 1596, 1598 (Fed.Cir.1988).

■ On appeal, Deuel challenges the Board's determination that the applied references establish a *prima facie* case of obviousness. In response, the PTO maintains that the claimed invention would have been *prima facie* obvious over the combined teachings of Bohlen and Maniatis. Thus, the appeal raises the important question whether the combination of a prior art reference teaching a method of gene cloning, together with a reference disclosing a partial amino acid sequence of a protein, may render DNA and cDNA molecules encoding the protein *prima facie* obvious under § 103.

Deuel argues that the PTO failed to follow the proper legal standard in determining that the claimed cDNA molecules would have been *prima facie* obvious despite the lack of structurally similar compounds in the prior art. Deuel argues that the PTO has not cited a reference teaching cDNA molecules, but instead has improperly rejected the claims based on the alleged obviousness of a method of making the molecules. We agree.

Because Deuel claims new chemical entities in structural terms, a *prima facie* case of unpatentability requires that the teachings of the prior art suggest *the claimed compounds* to a person of ordinary skill in the art.

---

7. Deuel is supported in its appeal by an *amicus curiae* brief submitted by the Biotechnology Industry Organization and the Bay Area Science Center. Amici urge that, contrary to controlling precedent, the PTO has unlawfully adopted a *per se* rule that a gene is *prima facie* obvious when at least part of the amino acid sequence of the protein encoded by the gene is known in the prior art.

Normally a *prima facie* case of obviousness is based upon structural similarity, *i.e.*, an established structural relationship between a prior art compound and the claimed compound. Structural relationships may provide the requisite motivation or suggestion to modify known compounds to obtain new compounds. For example, a prior art compound may suggest its homologs because homologs often have similar properties and therefore chemists of ordinary skill would ordinarily contemplate making them to try to obtain compounds with improved properties. Similarly, a known compound may suggest its analogs or isomers, either geometric isomers (cis v. trans) or position isomers (*e.g.*, ortho v. para).

In all of these cases, however, the prior art teaches a specific, structurally-definable compound and the question becomes whether the prior art would have suggested making the specific molecular modifications necessary to achieve the claimed invention. *See In re Jones,* 958 F.2d 347, 351, 21 USPQ2d 1941, 1944 (Fed.Cir.1992); *In re Dillon,* 919 F.2d 688, 692, 16 USPQ2d 1897, 1901 (Fed.Cir. 1990) (en banc) ("structural similarity between claimed and prior art subject matter, ... where the prior art gives reason or motivation to make the claimed compositions, creates a *prima facie* case of obviousness"), *cert. denied,* 500 U.S. 904, 111 S.Ct. 1682, 114 L.Ed.2d 77 (1991); *In re Grabiak,* 769 F.2d 729, 731–32, 226 USPQ 870, 872 (Fed.Cir. 1985) ("[I]n the case before us there must be adequate support in the prior art for the [prior art] ester/[claimed] thioester change in structure, in order to complete the PTO's *prima facie* case and shift the burden of going forward to the applicant."); *In re Lalu,* 747 F.2d 703, 705, 223 USPQ 1257, 1258 (Fed.Cir.1984) ("The prior art must provide one of ordinary skill in the art the motivation to make the proposed molecular modifications needed to arrive at the claimed compound.").

Here, the prior art does not disclose any relevant cDNA molecules, let alone close relatives of the specific, structurally-defined cDNA molecules of claims 5 and 7 that might render them obvious. Maniatis suggests an allegedly obvious process for trying to isolate cDNA molecules, but that, as we will indicate below, does not fill the gap regarding the subject matter of claims 5 and 7. Further, while the general idea of the claimed molecules, their function, and their general chemical nature may have been obvious from Bohlen's teachings, and the knowledge that some gene existed may have been clear, the precise cDNA molecules of claims 5 and 7 would not have been obvious over the Bohlen reference because Bohlen teaches proteins, not the claimed or closely related cDNA molecules. The redundancy of the genetic code precluded contemplation of or focus on the specific cDNA molecules of claims 5 and 7. Thus, one could not have conceived the subject matter of claims 5 and 7 based on the teachings in the cited prior art because, until the claimed molecules were actually isolated and purified, it would have been highly unlikely for one of ordinary skill in the art to contemplate what was ultimately obtained. What cannot be contemplated or conceived cannot be obvious.

The PTO's theory that one might have been motivated to try to do what Deuel in fact accomplished amounts to speculation and an impermissible hindsight reconstruction of the claimed invention. It also ignores the fact that claims 5 and 7 are limited to specific compounds, and any motivation that existed was a general one, to try to obtain a gene that was yet undefined and may have constituted many forms. A general motivation to search for some gene that exists does not necessarily make obvious a specifically-defined gene that is subsequently obtained as a result of that search. More is needed and it is not found here.

■ The genetic code relationship between proteins and nucleic acids does not overcome the deficiencies of the cited references. A prior art disclosure of the amino acid sequence of a protein does not necessarily render particular DNA molecules encoding the protein obvious because the redundancy of the genetic code permits one to hypothesize an enormous number of DNA sequences coding for the protein. No particular one of these DNAs can be obvious unless there is something in the prior art to lead to the particular DNA and indicate that it should be

prepared. We recently held in *In re Baird,* 16 F.3d 380, 29 USPQ2d 1550 (Fed.Cir.1994), that a broad genus does not necessarily render obvious each compound within its scope. Similarly, knowledge of a protein does not give one a conception of a particular DNA encoding it. Thus, *a fortiori,* Bohlen's disclosure of the N-terminal portion of a protein, which the PTO urges is the same as HBGF, would not have suggested the particular cDNA molecules defined by claims 5 and 7. This is so even though one skilled in the art knew that some DNA, albeit not in purified and isolated form, did exist. The compounds of claims 5 and 7 are specific compounds not suggested by the prior art. A different result might pertain, however, if there were prior art, *e.g.,* a protein of sufficiently small size and simplicity, so that lacking redundancy, each possible DNA would be obvious over the protein. *See In re Petering,* 301 F.2d 676 (CCPA 1962) (prior art reference disclosing limited genus of 20 compounds rendered every species within the genus unpatentable). That is not the case here.

The PTO's focus on known methods for potentially isolating the claimed DNA molecules is also misplaced because the claims at issue define compounds, not methods. *See In re Bell,* 991 F.2d 781, 785, 26 USPQ2d 1529, 1532 (Fed.Cir.1993). In *Bell,* the PTO asserted a rejection based upon the combination of a primary reference disclosing a protein (*and its complete amino acid sequence*) with a secondary reference describing a general method of gene cloning. We reversed the rejection, holding in part that "[t]he PTO's focus on Bell's method is misplaced. Bell does not claim a method. Bell claims compositions, and the issue is the obviousness of the claimed compositions, not the method by which they are made." *Id.*

■ We today reaffirm the principle, stated in *Bell,* that the existence of a general method of isolating cDNA or DNA molecules is essentially irrelevant to the question whether the specific molecules themselves would have been obvious, in the absence of other prior art that suggests the claimed DNAs. A prior art disclosure of a process *reciting a particular compound* or obvious variant thereof as a product of the process is,

of course, another matter, raising issues of anticipation under 35 U.S.C. § 102 as well as obviousness under § 103. Moreover, where there is prior art that suggests a claimed compound, the existence, or lack thereof, of an enabling process for making that compound is surely a factor in any patentability determination. *See In re Brown,* 329 F.2d 1006, 141 USPQ 245 (CCPA 1964) (reversing rejection for lack of an enabling method of making the claimed compound). There must, however, still be prior art that suggests the claimed compound in order for a *prima facie* case of obviousness to be made out; as we have already indicated, that prior art was lacking here with respect to claims 5 and 7. Thus, even if, as the examiner stated, the existence of general cloning techniques, coupled with knowledge of a protein's structure, might have provided motivation to prepare *a* cDNA or made it obvious to prepare *a* cDNA, that does not necessarily make obvious a particular claimed cDNA. "Obvious to try" has long been held not to constitute obviousness. *In re O'Farrell,* 853 F.2d 894, 903, 7 USPQ2d 1673, 1680–81 (Fed.Cir.1988). A general incentive does not make obvious a particular result, nor does the existence of techniques by which those efforts can be carried out. Thus, Maniatis's teachings, even in combination with Bohlen, fail to suggest the claimed invention.

■ The PTO argues that a compound may be defined by its process of preparation and therefore that a conceived process for making or isolating it provides a definition for it and can render it obvious. It cites *Amgen Inc. v. Chugai Pharmaceutical Co.,* 927 F.2d 1200, 18 USPQ2d 1016 (Fed.Cir.), *cert. denied,* 502 U.S. 856, 112 S.Ct. 169, 116 L.Ed.2d 132 (1991), for that proposition. We disagree. The fact that one can conceive a general process in advance for preparing an *undefined* compound does not mean that a claimed *specific* compound was precisely envisioned and therefore obvious. A substance may indeed be defined by its process of preparation. That occurs, however, when it has already been prepared by that process and one therefore knows that the result of that process is the stated compound. The process is part of the definition of the com-

pound. But that is not possible in advance, especially when the hypothetical process is only a general one. Thus, a conceived method of preparing some undefined DNA does not define it with the precision necessary to render it obvious over the protein it encodes. We did not state otherwise in *Amgen. See Amgen,* 927 F.2d at 1206–09, 18 USPQ2d at 1021–23 (isolated/purified human gene held nonobvious; no conception of gene without envisioning its precise identity despite conception of general process of preparation).

We conclude that, because the applied references do not teach or suggest the claimed cDNA molecules, the final rejection of claims 5 and 7 must be reversed. *See also Bell,* 991 F.2d at 784–85, 26 USPQ2d at 1531–32 (human DNA sequences encoding IGF proteins nonobvious over asserted combination of references showing gene cloning method and complete amino acid sequences of IGFs).

■ Claims 4 and 6 are of a different scope than claims 5 and 7. As is conceded by Deuel, they generically encompass all DNA sequences encoding human and bovine HBGFs. Written in such a result-oriented form, claims 4 and 6 are thus tantamount to the general idea of all genes encoding the protein, all solutions to the problem. Such an idea might have been obvious from the *complete* amino acid sequence of the protein, coupled with knowledge of the genetic code, because this information may have enabled a person of ordinary skill in the art to envision the idea of, and, perhaps with the aid of a computer, even identify all members of the claimed genus. The Bohlen reference, however, only discloses a partial amino acid sequence, and thus it appears that, based on the above analysis, the claimed genus would not have been obvious over this prior art disclosure. We will therefore also reverse the final rejection of claims 4 and 6 because neither the Board nor the patent examiner articulated any separate reasons for holding these claims unpatentable apart from the grounds discussed above.

One further matter requires comment. Because Deuel's patent application does not describe how to obtain any DNA except the disclosed cDNA molecules, claims 4 and 6 may be considered to be inadequately sup-

ported by the disclosure of the application. *See generally Amgen Inc. v. Chugai Pharmaceutical Co.,* 927 F.2d 1200, 1212–14, 18 USPQ2d 1016, 1026–28 (Fed.Cir.) (generic DNA sequence claims held invalid under 35 U.S.C. § 112, first paragraph), *cert. denied,* 502 U.S. 856, 112 S.Ct. 169, 116 L.Ed.2d 132 (1991); *In re Fisher,* 427 F.2d 833, 839, 166 USPQ 18, 24 (CCPA 1970) (Section 112 "requires that the scope of the claims must bear a reasonable correlation to the scope of enablement provided by the specification to persons of ordinary skill in the art."). As this issue is not before us, however, we will not address whether claims 4 and 6 satisfy the enablement requirement of § 112, first paragraph, but will leave to the PTO the question whether any further rejection is appropriate.

We have considered the PTO's remaining arguments and find them not persuasive.

## CONCLUSION

The Board's decision affirming the final rejection of claims 4–7 is reversed.

*REVERSED*