DYK, Circuit Judge,
concurring-in-part and dissenting-in-part.
I join Parts I and II of the majority’s opinion, but I respectfully dissent from Part III. In my view, the majority erred in holding that the asserted claims of the '112 *1311 patent would not render obvious the asserted claims of the '620 and '447 patents (collectively the “Novartis patents”) and in holding that there was, accordingly, no interference-in-fact.
In the mid-1980s, the '112 patent and the Novartis patents were co-pending before the Patent and Trademark Office (“PTO”). At the time, there was concern that pathogens, like the HIV and hepatitis virus, were contaminating the supply of hemophilia treatments made from human Factor VIII proteins. Genetics and Novartis thus competed to clone safer, synthetic forms of Factor VIII. Because of the large size of Factor VIII, however, yields from the host cells expressing the gene were very low. The patents-in-suit were directed to solving this problem by producing truncated forms of Factor VIII that would nonetheless maintain the same pro-coagulant (i.e. blood-clotting) activity of the full-length protein.
By comparing human Factor VIII to porcine Factor VIII, Genetics discovered that, while significant regions of human and porcine Factor VIII were homologous, the large B domain of human Factor VIII diverged greatly from the B domain of porcine Factor VIII. Because porcine Factor VIII was nonetheless effective in treating human hemophilia patients, Genetics deduced that the B domain was superfluous and could be excised without compromising Factor VIII’s procoagulant activity. This discovery led to the innovations of the '112 patent. The truncated Factor VIII proteins of the '112 patent have a “substantially lower molecular weight,” '112 patent col.2 11.10-12, but have “similar pro-coagulant activity” to the full-length version of human Factor VIII, id. col.l 11.8-9. These “simpler molecules” were advantageous because they could “be produced ... at a much lower cost.” Id. col.20 11.9-14. Around the same time, Novartis scientists were researching a more efficient way to clone Factor VIII. The objective of the Novartis patents was, similarly, to design a truncated protein with “activity equal to that of cloned full-length Factor VIII[ ].” '447 patent col.2 11.18-19; '620 patent col.2 11.18-19.
All of the patents-in-suit are directed to truncated Factor VIII proteins in which the B domain is either partially or completely deleted. These proteins differ mainly in one respect: while the Novartis proteins retain the a3 region, the proteins of the '112 patent permit (but do not require) deletions in that region. As it turned out, years later, independent researchers discovered that the a3 region had the previously unforeseen benefit of being able to bind to von Willebrand Factor (“vWF”). Though it had been known since the late 1970s that vWF had a stabilizing effect on Factor VIII, the location of vWF binding in the a3 region was not known until at least 1988, years after the Novartis patents were filed, as the Novartis witnesses themselves described. One Novartis expert admitted that there was “nothing in the scientific literature by April 1986 suggesting the importance of [the a3 region] to interactions between Factor VIII and vWF.” J.A. 2683. And one of the inventors testified that the Novartis patents “do[] not specifically tell you [the location of the vWF binding sites within the Factor VIII protein], [because] that was not the intention of the patent, to specify the binding to von Willebrand Factor.” J.A. 3732. The majority does not dispute this, stating that “Genetics concedes that it was not known prior to the filing of the '620 patent that [the a3 region] was critical to maintain vWF binding.” Maj. Op. at 1304.
In my view, there are four fundamental flaws with the majority’s conclusion of non-obviousness. First, the majority holds that the Novartis patents could not be *1312 obvious over the '112 patent unless Genetics could identify “some reason that would have prompted a researcher to modify” the '112 patent to retain the a3 region. Id. at 1303. However, a requirement for a motivation to retain the a3 region should not be the test where, from an objective standpoint, no inventor — including the Novartis inventors themselves — could have been aware of the benefits of retaining the a3 region at the time of the invention. Rather, we should look to whether there was enough structural similarity between the patents-in-suit to make a prima facie case of obviousness, given what was known to the inventors at the time of the invention.
Our precedent has established that “[sjtructural relationships may provide the requisite motivation or suggestion to modify known compounds to obtain new compounds.” In re Deuel, 51 F.3d 1552, 1558 (Fed.Cir.1995). Moreover, such structural similarity (i.e., an established structural relationship between a prior art compound and the claimed compound) can give rise to a case of prima facie obviousness. Id. Thus, “a known compound may suggest its [homologs,] analogs, or isomers” because such compounds “often have similar properties and therefore chemists of ordinary skill would ordinarily contemplate making them to try to obtain compounds with improved properties.” Id. In In re Jones, 958 F.2d 347, 349 (Fed.Cir.1992), we acknowledged that “particular types or categories of structural similarity[,] without more[,] have, in past cases, given rise to prima facie obviousness.” (citing In re Dillon, 919 F.2d 688, 692-94 (Fed.Cir.1990) (tri-orthoesters and tetra-orthoesters), cert. denied, 500 U.S. 904, 111 S.Ct. 1682, 114 L.Ed.2d 77 (1991)); In re May, 574 F.2d 1082 (CCPA 1978) (stereoisomers); In re Wilder, 563 F.2d 457 (CCPA 1977) (adjacent homologs and structural isomers); In re Hock, 57 CCPA 1292, 428 F.2d 1341 (1970) (acid and ethyl ester).[1] In this case, the truncated Factor VIII proteins of the '112 patent and the truncated Factor VIII proteins of the Novartis patents are not merely homologs, analogs, or isomers — they are all variants of the exact same protein, exhibiting the exact same procoagulant functions. Here, the majority found that the patents-in-suit differed in terms of the size of the permitted amino acid deletions, the location of the deletions, and the degree of allowable amino acid substitutions. However, these differences are of no consequence to the core procoagulation function of the proteins. This is so because the main innovation of the patents-in-suit is the discovery that the B domain is completely unnecessary to procoagulation. Consequently, it does not matter whether the deletions are large or small or whether the deletions begin at one amino acid or another. Any deletion in the B domain, ipso facto, would retain the procoagulation function of Factor VIII. The similarities in structure and function would provide the requisite motivation to modify the proteins of the '112 patent to obtain the proteins of the Novartis proteins. See In re Dillon, 919 F.2d 688, 696 (“[T]he fact that the claimed and the prior art compounds possessed the same activity *1313 were added factors in the establishment of a prima facie case.”).
Second, under our prior authority, a prima facie case of obviousness can also exist if the range of an earlier patent incorporates the range of later patents.[2] That is the case here where it is clear that the range of retentions in the '112 patent fall within the range of retentions of the Novartis patents, as discussed above. Our case law has held that “[a] prima facie case of obviousness typically exists when the ranges of a claimed composition overlap the ranges disclosed in the prior art.” In re Peterson, 315 F.3d 1325, 1329-30 (Fed. Cir.2003). “[E]ven a slight overlap in range establishes a prima facie case of obviousness.” Id. at 1329; see also In re Geisler, 116 F.3d 1465, 1469 (Fed.Cir.1997) (finding prima facie obviousness where range of prior art reference (100-600 Angstroms) overlapped the claimed range (50-100 Angstroms)); In re Woodruff, 919 F.2d 1575, 1578 (Fed.Cir.1990) (holding a claimed invention obvious because claimed range (“more than 5% to about 25%” carbon monoxide) abutted range of prior art (“about l-5%” carbon monoxide)); In re Malagari, 499 F.2d 1297, 1303 (CCPA 1974) (finding prima facie obviousness where the claimed range of the prior art reference (0.020-0.035% carbon) overlapped the claimed range (0.030-0.070% carbon)). Significantly, when “the claimed ranges are completely encompassed by the prior art, the conclusion [of obviousness] is even more compelling than in cases of mere overlap.” Peterson, 315 F.3d at 1330.[3] Here, as in Peterson, the range of retentions or deletions in the Novartis patents overlap significantly with the range of the '112 patent, and are, in my view, prima facie obvious.
The majority, nevertheless, concludes that the compound here was not the “ ‘typical ]’ case” contemplated in Peterson, Maj. Op. at 1306 (quoting 315 F.3d at 1329), pointing to a footnote in Peterson that opined:
Although ranges that are not especially broad invite routine experimentation to discover optimum values, rather than require nonobvious invention, we do not have here any assertion that the disclosed range is so broad as to encompass a very large number of possible distinct compositions. We thus do not need to decide whether a disclosed range of such breadth might present a situation analogous to our cases involving the failure of a very broad disclosed genus of substances to render prima facie obvious specific substances within its scope.
315 F.3d at 1330 n. 1 (emphases added). Because the majority found that the '112 patent claims encompassed a very large *1314 number of possible distinct compositions— nearly “68,000 truncated variants” — it declined to extend the reasoning in Peterson to a “disclosed range of such breadth.” Maj. Op. at 1306.
However, as the court in Peterson made clear, it is the facts of a particular case that will render it “typical” or not. 315 F.3d at 1329. An expansive range of variants should not per se defeat a prima facie case of obviousness. Moreover, the court’s concern in Peterson was less the breadth of the claims, than the ability to conduct “routine experimentation to discover optimum values.” Id. at 1330 n. 1. Narrower ranges would presumably invite more routine experimentation and “motivate! ] [scientists] to determine where in a disclosed set of ... ranges is the optimum combination,” see id. at 1330, while broader ranges would presumably discourage such experimentation. Here, there is no suggestion or stated need for further experimentation to discover some “optimum range.” As the majority acknowledges, the “typical desire of scientists to find an optimum value within a narrow disclosed range, does not apply to the facts of this case ” because “the only evidence of motivation in the present record is that of researchers [trying] to make smaller, truncated proteins to solve the cloning difficulties associated with the large size of Factor VIII.” Maj. Op. at 1306 (emphasis added; internal citations omitted). Because there was no motivation to optimize for some value within the range of possible retentions, the large breadth of possible protein variants is of no consequence. In sum, I would find that the claims of the Novartis patents are prima facie obvious in view of the overlapping ranges of the '112 patent. The burden of proving nonobviousness should thus have shifted to the holder of the later-developed patent, in this case, Novartis. Peterson, 315 F.3d at 1330.
Third, the majority appears to suggest that the “retention] of amino acids in the [a3] region” was “contrary to the teachings of the '112 patent.” Maj. Op. at 1304. This is wrong on the facts. The majority ignores that some variants of the '112 patent actually retain the a3 region and therefore have the ability to bind to vWF. For instance, claim 10 of the '112 patent claims a truncated Factor VIII protein having one of three specific deletions, two of which are the deletions of amino acids 981-1563 and 759-1640. See col.26 11.28-34. These two deletions clearly retain the a3 region (amino acids 1649-1689). Retention of the a3 region is also within the scope of retentions allowed by claim 1 of the '112 patent.[4] Therefore, many of the variants claimed in the '112 patent actually conserve the a3 region necessary for vWF binding. If, as the majority concludes, “the structure of a claimed compound and its properties are inseparable for purposes of § 103,” it seems inconsistent to credit the a3 region in the Novartis compounds for giving rise to vWF binding while not doing the same for the compounds of the '112 patent. Maj. Op. at 1307 (citing Sanofi-Synthelabo v. Apotex, Inc., 550 F.3d 1075, 1086 (Fed.Cir.2008) (“For chemical compounds, the structure of the compound and its properties are inseparable considerations in the obviousness determination.”); In re Papesch, 50 CCPA 1084, 315 F.2d 381, 391 (1963) (“From the standpoint of patent law, a compound and all of its properties are inseparable; they are one and the same thing.”)).
The majority also urges that some variants of the '112 patent teach away from retaining the a3 region. The majority, however, ignores the fact that certain vari *1315 ants of the Novartis patents also teach away from keeping the a3 region intact, with the result that vWF binding is not achieved. In particular, the Novartis patents allow up to 10 percent of the amino acids in the Factor VIII protein to be substituted, including substitutions in the a3 region:
[U]sually not more than 10, more usually not more than 5[%], preferably not more than about 1[%] of the amino acids in the chains will differ from the amino acids naturally present in the Factor VIII[ ] ... C domain[ ]---- Conservative substitutions include: ... Phenylalanine] -» Trfyptophan] <- -> Tyr[osine].
'620 patent col.4 11.39-53. With the substitution of phenylalanine for tyrosine in the a3 region — that is, a “conservative substitution” expressly taught in the Novartis patents — vWF binding would be “completely abolished.” See Anja Leyte et al., Sulfation of Tyr-1680 of Human Blood Coagulation Factor VIII Is Essential for the Interaction of Factor VIII with von Willebrand Factor, 266 J. Biological Chem. 740, 744 (1991), available at J.A. 6084-90 (“vWF binding was completely abolished” when “Tyr[osine]-1680 [in the a3 region] ... was replaced by phenylalanine.”). In this respect, the '112 patent and the Novartis patents all teach some variants that retain the a3 region and some variants that teach away from retaining the a3 region necessary for vWF binding.
Finally, the majority found that the later-discovered, undisclosed benefits of retaining the a3 region qualified as unexpected results to help defeat the prima facie case of obviousness, even though the role of the a3 region was not appreciated as of the Novartis patents’ priority date. I disagree. The majority’s finding of nonobviousness is based entirely on hindsight and happenstance, and not on what the inventors knew at the time the Novartis patents were filed. See 35 U.S.C. § 103(a) (stating that an invention cannot be patented if “the subject matter as a whole would have been obvious at the time the invention was made”) (emphasis added). The Supreme Court has never suggested that it is permissible to look beyond the inventor’s knowledge at the time of patent filing in determining unexpected results. To the contrary, the Supreme Court has characterized such after-acquired knowledge as an “afterthought,” Ball & Socket Fastener Co. v. Kraetzer, 150 U.S. 111, 117, 116-17, 14 S.Ct. 48, 37 L.Ed. 1019 (1893), and has declined to give it weight in determining patent validity. For example, in Graham v. John Deere Co., 383 U.S. 1, 25, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), the Supreme Court rejected the patentee’s argument that his patented plow had the unexpected result of additional “flex” over the prior art, noting that “[n]o ‘flexing’ argument was raised in the Patent Office.” See also Lincoln Eng'g Co. v. Stewar-Warner Corp., 303 U.S. 545, 550, 58 S.Ct. 662, 82 L.Ed. 1008 (1938) (“If this [new feature] were so vital an element ... it is strange that all mention of it was omitted [in the specification].”).
Similarly, our court and our predecessor court have rejected later-acquired knowledge as supporting unexpected results. Early cases from the Court of Customs and Patent Appeals (“CCPA”) have gone so far as to hold that unexpected results must be described in the specification itself.[5] Contrary to the majority’s sugges *1316 tion, Maj. Op. at 1308, I do not propose such a stringent requirement. But I do think that unexpected properties must either be set forth in the specification or contemporaneously known to the inventors, rather than being discovered long after the fact.
In more recent CCPA cases, the court has suggested that a new, undisclosed feature must “inherently flow from the indicated use ” of the invention. In re Zenitz, 52 CCPA 746, 333 F.2d 924, 927 (1964) (emphasis added); see also In re Khelghatian, 53 CCPA 1441, 364 F.2d 870, 876 (1966) (allowing an unexpected result to overcome an obviousness rejection where the improved result “ ‘inherently flow[ed]’ from what was originally disclosed [in the patent application]”) (emphasis added). Here, the sole “indicated use” of the truncated Factor VIII proteins was the ability to procoagulate blood — not the ability to bind to vWF. In fact, the parties do not dispute that the protein’s ability to pro-coagulate blood was completely independent of its ability to bind to vWF. Thus, the ability to bind to vWF was a wholly new and undisclosed function that did not “inherently flow from the indicated use” of the invention — the procoagulation of blood. See Zenitz, 333 F.2d at 927. This later-discovered advantage should not have been allowed to defeat a finding of obviousness.
Nonetheless, the majority concludes that Sanofi, 550 F.3d at 1086, Knoll Pharmaceutical Co. v. Teva Pharmaceuticals USA Inc., 367 F.3d 1381, 1385 (Fed.Cir. 2004), and Papesch, 315 F.2d at 391, support its decision to ignore that the inventors here knew nothing about the benefits of retaining the a3 region at the time its patents were filed. However, Sanofi, Knoll, and Papesch are quite different. In contrast to the present case, in each of these cases, it was shown that, as of the time of the invention, the inventor had contemplated that a particular claimed structure would confer a special and unanticipated advantage, even if the full scope of that advantage was unknown. While it may have been known at the time of the Novartis patent that binding to vWF helped increase the stability of Factor VIII, there was no indication that the structure proposed in the Novartis patent (i.e., the retention of the a3 region) was any more effective in doing this than the structure of the '112 patent. Nor were the differences in the Novartis patents designed to achieve any such objective.
In Sanofi, we affirmed the district court’s holding that the unpredictable and unusual properties of a claimed structure and the therapeutic advantages provided by that structure weighed in favor of non-obviousness. 550 F.3d at 1090. Unlike the prior art, the claimed compound “provide[d] all of the antiplatelet activity and none of the adverse neurotoxicity” of the prior art. Id. at 1087. At the time of the invention, it was known that scientists were “seeking optimum anti-platelet aggregation properties with minimal undesirable effects.” Id. at 1079. Thus, it was clear that the evidence of unexpected results was based on the knowledge of what the inventor wanted to achieve at the time of the invention.
*1317 In Knoll, the district court refused to consider evidence showing the greater analgesic effect of a combination of drugs over the prior art, concluding that “the unexpected benefits or results were discovered after the ... patent had been issued.” 367 F.3d at 1384 (internal quotation marks omitted). We reversed, finding that, “[c]ontrary to the district court’s perception, the specification expressly acknowledge^] that the efficacy of the combination [was] ‘surprising’ ” and stated that the combination of the drugs obtained “an analgesic effect greater than that obtained by increasing the dose of either [analgesic] alone.” Id. To demonstrate the unexpected activity of the claimed combination, the patentee submitted additional data from experiments conducted after the patent had been filed. Id. at 1385. In concluding that the district court erred in rejecting this after-acquired data, we simply held that it was “not improper to obtain additional support consistent with the patented invention” because “understanding of the full range of an invention [was] not always achieved at the time of filing the patent application.” Id. at 1385 (emphases added). Thus, where there was already support showing that the inventor contemplated the unexpected result at the time the patent was filed, it was not improper to supplement this evidence of unexpected results with evidence obtained at a later time. Knoll is therefore consistent with a requirement that unexpected results be tied to what the inventor knew at the time of the invention.
In Papesch, the Board of Patent Appeals and Interferences (“Board”) had rejected the claims for a chemical compound containing three ethyl groups as obvious over prior art homologs that contained three methyl groups. 315 F.2d at 383. The applicant responded with an affidavit showing that the claimed compound was an active anti-inflammatory agent while the prior art was inactive in that respect, but the Board rejected the affidavit. Id. Our predecessor court reversed, finding that, in addition to comparing the structural similarities and differences between a claimed compound and the prior art, a court should also “tak[e] into consideration their biological and pharmacological properties.” Id. at 391. The court therefore accepted the affidavit and reversed the decision of the Board. Id. at 392. The specification in Papesch clearly underscored the advantageous property of the drugs, expressly stating that the “compounds of this invention have been found to possess unexpectedly potent anti-inflammatory activity in contrast to the related trimethyl compound.” Id. at 382. This unexpected result was a property contemplated by the inventor at the time of the invention.
Thus, the cases cited by the' majority actually support a requirement that an unexpected result be either contained in the specification or contemporaneously known to the inventors. This rule is consistent "with the written description requirement, which demands that the invention be in possession of the inventor as of the time the patent was filed. Ariad Pharms., Inc. v. Eli Lilly & Co., 598 F.3d 1336, 1351 (Fed.Cir.2010) (en banc) (holding that our written description requirement requires that a specification “reasonably conveyf] to those skilled in the art” that the inventor “actually invented” and “had possession of the claimed subject matter as of the filing date [of the invention]”) (citing Vas-Cath Inc. v. Mahurkar, 935 F.2d 1555, 1562-63 (Fed.Cir.1991)); see also Ralston Purina Co. v. Far-Mar-Co, Inc., 772 F.2d 1570, 1575 (Fed.Cir. 1985). While, as the majority points out, certain secondary considerations, such as evidence of commercial success, can depend on after-acquired knowledge, such evidence must be directed to the significance of the invention and its scope. *1318 Those factors can not expand the scope of the invention beyond what was known to the inventors at the time of the patent filing.
The majority rule — dispensing with any requirement that an inventor possess knowledge of the unexpected results at the time the patent was filed — is not only unsupported by the cases it cites, it is also contrary to common sense. An applicant should not be able to avoid an obviousness determination merely by claiming additional, undifferentiated structure, like the a3 region, without any showing that this structure conferred any known benefit over the prior art at the time the invention was made. Just as a challenger to a patent must rely on a known motivation to combine existing prior art to achieve what the invention was designed achieved,[6] so too the patent holder must prove that he actually contemplated the unexpected results at the time the patent was filed and not at some later time.
It is significant that if Genetics had brought this action at an earlier time-before it was discovered that vWF binding resided in the a3 region — the Novartis patents would likely have been found obvious. Instead, by happenstance and on hindsight, Novartis can now claim an advantage over the '112 patent based on information it did not know at the time of filing and based on research that was conducted by other parties.
My fear is that the majority’s rule could ultimately stifle the important incentives for innovation that drive our patent system. Even though Novartis did not foresee the significance of the a3 region to vWF binding at the time its patent was filed, the majority has effectively allowed Novartis to broaden the-scope of its claims to usurp the fruits of research by the subsequent, independent inventors who actually discovered the location of vWF binding in the a3 region. By ruling that a patentee can have a monopoly on the later-discovered properties of a structure merely by claiming the structure itself, the majority’s decision would discourage others from investing in future research into that very structure.
I would therefore hold that the asserted claims of the '112 patent would render the asserted claims of the Novartis patents prima facie obvious, satisfying the first prong of the two-way interference test. I would not reach the question of whether the second prong would be satisfied, that is, whether the asserted claims of the Novartis patents would render obvious or anticipated the asserted claims of the '112 patent. It seems to me likely that they would, but that is an inquiry I would leave to the district court on remand.

. See also In re Mayne, 104 F.3d 1339, 1343 (Fed.Cir.1997) (finding a claimed enterokinase recognition sequence containing the amino acid sequence Phe-Pro-Leu was merely "an obvious functional equivalent” to prior art sequences that included arrangements of Phe-Pro-Ile and Leu-Pro-Leu); In re Dillon, 919 F.2d 688, 693 (Fed.Cir.1990) (finding a prima facie case of obviousness where the prior art tri-orthoester compound was found to be equivalent to the claimed tetra-orlhoester compound and the use of the tri-orthoester as a fuel additive was expected to produce essentially the same result as the use of the tetra-orthoester); In re Payne, 606 F.2d 303, 313-15 (CCPA 1979) (discussing the presumption of obviousness based on close structural similarity).

. Though the majority does not appear to dispute that the broader range of deletions in the '112 patent subsumed the narrower range of deletions in the Novartis patents, I think the proper focus should be on the range of retentions, not the range of deletions. This is so because we are concerned with whether the Novartis patents can be differentiated based on what they retain rather than what they delete. Nonetheless, whether the focus is on deletions or retentions, there is still an overlap.

. "We have also held that a prima facie case of obviousness exists when the claimed range and the prior art range do not overlap but are close enough such that one skilled in the art would have expected them to have the same properties." Peterson, 315 F.3d at 1329; see Titanium Metals Corp. v. Banner, 778 F.2d 775, 776, 783 (Fed.Cir.1985) (concluding that a claim directed to an alloy containing "0.8% nickel, 0.3% molybdenum, up to 0.1% maximum iron, balance titanium” would have been prima facie obvious in view of a reference disclosing alloys containing 0.75% nickel, 0.25% molybdenum, balance titanium and 0.94% nickel, 0.31% molybdenum, balance titanium).

. For example, claim 1 of the '112 patent teaches deletions that range from 581 to 949 amino acids. A more conservative deletion in this range could still leave intact the a3 region critical to vWF binding.

. See In re Herr, 304 F.2d 906, 909 (CCPA 1962) ("[If] an [unexpected advantage] is not disclosed in appellant’s application, he is not in a favorable position to urge it as a basis for the allowance of claims.”) (internal quotation marks omitted) (citing In re Lundberg, 45 CCPA 838, 253 F.2d 244, 247 (1958)); In re Crawford, 45 CCPA 750, 250 F.2d 370, 373 (1957) C‘[T]here is no disclosure in appellant's application that the glass of which the casing is made has the property recited in *1316 [the claim] of ‘substantially complete disintegration at a vibration frequency corresponding to that of the shock wave generated by detonation of the explosive body' and accordingly patentability cannot be predicated on that feature.”); In re Stewart, 42 CCPA 937, 222 F.2d 747, 754 (1955) ("Unexpected results sufficient to spell out patentability must be disclosed, not in briefs or affidavits filed in support of such patentability, but instead in the specification itself. In adjudging, in the first instance, a patent applicant’s right to a patent, we are guided in our determination by that which is taught in the application and not by some subsequent undisclosed discovery.”).

. As we discussed in Eisai Co. Ltd. v. Dr. Reddy’s Labs., Ltd., 533 F.3d 1353, 1359 (Fed. Cir.2008), obviousness must be judged from the knowledge of one skilled in the art at the time of invention:
First, KSR assumes a starting reference point or points in the art, prior to the time of invention, from which a skilled artisan might identify a problem and pursue potential solutions. Second, KSR presupposes that the record up to the time of invention would give some reasons, available within the knowledge of one of skill in the art, to make particular modifications to achieve the claimed compound.... Third, ... KSR presumes that the record before the time of invention would supply some reasons for narrowing the prior art universe to a finite number of identified, predictable solutions,
(internal citations and quotation marks omitted) (emphases added).